IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

06 MAY -4 AM 8: 57

CLERK-ALBUQUERQUE

JUDITH MILLS,

        Plaintiff,

v.                            Case No. CIV-05-151 MCA/LFG

SOUTHWEST INNKEEPERS INC., d/b/a
BEST WESTERN SALLY PORT INN & SUITES,

        Defendant.

### PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW Plaintiff, by and through her counsel of record, and offers the following as her proposed Findings of Fact and Conclusions of Law in anticipation of the trial scheduled for May 18, 2006.

#### PROPOSED FINDINGS OF FACT:

1. In July, 2002, Judith Mills was a forty-two (42) year old married mother of one, living in Rochester Hills, MI.

2. Ms. Mills worked as a professional fitness trainer for more than twenty-five (25) years. Her career involved daily classes in Pilates, Yoga, dance and various exercise forms including water exercise and weight lifting.

3. Ms. Mills' profession required that she be in top physical condition. In order to teach classes, Ms. Mills was required to constantly demonstrate movements and provide hands-on correction for students. She was required to spot students who were using weight training equipment.

4. In July, 2002, Ms. Mills was employed by her business, SmartBodies, which she

-1-



formed in 1992. She was also employed in her professional capacity by Oakland University and Equilibrium, a Pilates fitness studio based in Bloomfield Hills, MI.

5. The record indicates that Ms. Mills enjoyed a great deal of professional success prior to July, 2002. Her clients included former NBA Hall of Fame basketball player, Isaiah Thomas. She has provided the Court with a great number of testimonials from former clients, all of whom expressed a good deal of satisfaction with her professional abilities as a fitness trainer.

6. Ms. Mills' profession also required that she be able to perform maintenance work and lift, clean and store the equipment used in her classes.

7. When equipment was used during Ms. Mills' classes, she was required to bend to adjust springs, lift support boxes, assist clients with overhead apparatus, support the client's weight and provide occasional massages.

8. When equipment was not used, Ms. Mills was required to get up and down from the floor numerous times to demonstrate movements and spots clients for safety.

9. Ms. Mills' ability to move, lift, bend and exercise was the core of her professional life.

10. In the months leading up to July, 2002, Ms. Mills decided to expand her SmartBodies business because her daughter was old enough to permit Ms. Mills to accept many more teaching offers.

11. As part of the SmartBodies expansion, Ms. Mills purchased new fitness training equipment at a cost of $8,109.90. She had formed a Board of Directors and had issued expansion promotional materials which anticipated a projected revenue of $144,500.00 per year.

12. Ms. Mills' wages in 2001 and 2002 ranged from $25.00 to $45.00 per hour at Oakland University. Her personal sessions at SmartBodies booked at $65.00 per hour.

13. In 2001, before the expansion, Ms. Mills earned $10,425.00 from SmartBodies and $4,433.50 from Oakland University. This income was based on part-time work ranging from seven (7) to twenty (20) hours per week. After the expansion, Ms. Mills anticipated teaching ten (10) client sessions per week and group classes at $40.00 per hour per participant. Projected estimates anticipated ten (10) new client sessions per week at $65.00 per hour and group classes of up to 35 people per class, twice per week. Thus her anticipated revenue was $144,500.00 per year.

14. Ms. Mills enjoyed a good marriage and relationship with her husband, David, before July, 2002. Her hobbies including gardening, hiking and, of course, yoga, exercise and meditation.

15. On July 1, 1002, Ms. Mills and her daughter were on vacation in Roswell, New Mexico, staying at the Sally Port Inn.

16. On the date in question, the Sally Port Inn was owned and operated by the Defendant, Southwest Innkeepers, Inc.

17. For some unspecified period of time prior to July 1, 2002, employees at the Sally Port Inn, including Teresa Lykins and Tara Moe, had noted that there was a water leak in the ceiling above the area where the breakfast buffet was set up for customers.

18. Ms. Lykins and Ms. Moe both complained to the maintenance staff and managers that the ceiling water leak was dangerous because it was repeatedly causing water to accumulate on the floor in the vicinity of the breakfast buffet. They warned that the leak needed to be fixed

before somebody slipped and fell in the water and got hurt.

19.     The floor where the breakfast buffet was located was a hard tile. Normally, employees of the Sally Port would cover the tile with a soft rubber and felt mat so that the floor would not be slippery or dangerous.

20.     On the morning of July 1, 2002, the floor mat was not present in front of the breakfast buffet. The evidence indicates that the mat had become saturated with water and was either too heavy or was too messy in the judgment of the employees responsible for placing it at the buffet.

21.     On the morning of July 1, 2002, Ms. Mills slipped and fell on the hard tile floor as she went through the breakfast buffet line at the Sally Port Inn. The only person who claims to have witnessed the fall is former employee Teresa Lykins who testified that the Plaintiff slipped in some water typical of the type of water that accumulated from the ceiling leak, and landed full force on her posterior.

22.     Ms. Mills did not see what caused her to fall (or she would not have stepped into it). She does know there was no mat on the tile floor. A Sally Port employee who helped Ms. Mills after the fall and drove her to the hospital repeatedly told her that the employees had not put the mat on the floor that morning because it was wet and "too heavy to move".

23.     Plaintiff was in excruciating pain as soon as she hit the floor. Her first thought was that she had a broken hip.

24.     Ms. Mills was taken to the local emergency room where she was examined, treated, prescribed pain medications and released. She drove herself and her twelve (12) year old daughter back to Michigan, which took several days, because she had to repeatedly stop and

rest due to her back pain.

25.  After returning home Ms. Mills first sought treatment from her family physician, Al Joucys. Dr. Joucys referred her to an orthopaedist, Dr. Rapp, and a neurologist, Dr. Hoekstra.

26.  All of Ms. Mills physicians concluded that she had suffered an acute disc herniation at L4-L5. The injury was causing Ms. Mills to feel constant pain radiating to her lower back and down her right thigh and leg. The pain restricts her ability to move freely and makes it impossible for Ms. Mills to perform her professional training duties.

27.  Ms. Mills' doctors agreed that she should first attempt conservative therapy along with medications and physical therapy.   Ms. Mills underwent two (2) different courses of physical therapy as instructed by her doctors. She also took the medications that were prescribed and attempted trigger point injections.

28.  The deposition testimony of the orthopaedist, Dr. Rapp, establishes that Ms. Mills would require surgical intervention to alleviate her symptoms if the physical therapy and conservative treatment did not provide her with pain relief and restore her normal range of motion. Dr. Rapp also testified that spinal surgery could not guarantee any better result or improvement of Ms. Mills' symptoms. He also testified that the cost of such surgery would be in the range of $10,000.00 to $15,000.00.

29.  The pain and loss of motion caused by her injury has and continues to prevent Ms. Mills from working as a professional trainer.

30.  As a direct consequence of losing her professional trainer income, Ms. Mills and her family were forced to move to Virginia in 2003 so that her husband, Daniel, could take a

better paying job.

31. Ms. Mills elected not to attempt surgical repair of her back injury after the physical therapy and medical treatment did not provide her with any significant improvement in her symptoms. Since moving to Virginia, she has elected to use yoga and exercise to maintain her physical condition to the best of her ability.

32. Ms. Mills' condition has not improved to any significant extent, and does not permit her to earn a living in her chosen profession as a sports trainer.

33. Ms. Mills' condition has severely impacted her ability to enjoy day to day life. She can no longer garden or walk for extended periods of time. Her back pain has severely impacted, if not totally eliminated, the intimacy and consortium she previously enjoyed with her husband, Daniel.

34. Ms. Mills has elected not to undergo surgical repair because there are no guarantees that surgery will improve her condition. She has limited her use of medications because she does not want to become addicted to pain medications.

35. Ms. Mills earned $6,730.00 in 2002 operating SmartBodies. She earned $2,940.00 from Oakland University. Insofar as these amounts were earned before her injury, after the first six months of 2002, Ms. Mills lost $9,670.00 in earnings for the second half of 2002.

36. Ms. Mills has not earned any income as a personal trainer from the end of 2002 through the present. Using her 2002 earnings, her actual lost earnings to date are $ 19,340.00 per year.

37. Ms. Mills had an earning capacity of $144,500.00 per year. Assuming she could

find a job paying minimum wage outside her chosen profession at $5.15 per hour, which is the minimum wage in New Mexico and Virginia (with the exception of certain metropolitan areas which have declared higher minimum wages), her lost earning capacity is $144,500.00 less $10,712.00 or $133,788.00 per year.

38. Based on the totality of the evidence presented, the Court concludes that Ms. Mills could reasonably have been expected to continue to work as a professional trainer until age 55.

39. Ms. Mills incurred medical expenses in the amount of $ 8,468.59 for treatment and diagnosis of the injuries she sustained as a result of her fall.

### CONCLUSIONS OF LAW:

1. An owner or occupant of property owes a visitor a duty to exercise ordinary care to keep the premises safe for the visitor's use. This duty applies whether or not a dangerous condition is obvious. In performing this duty, the owner or occupant is charged with knowledge of any condition on the premises of which it would have had knowledge had it made a reasonable inspection of the premises, or which was caused by the owner or occupant or its employees. NMRA 13-1318.

2. The Defendant breached its duty to keep its premises safe for the use of its visitor, Judith Mills, on July 1, 2002 at the Sally Port Inn in Roswell, New Mexico. This is true regardless of whether the dangerous condition was created by a puddle of water due to a ceiling leak or food or other materials dropped on the tile floor by other visitors or employees due to the undisputed fact that a soft rubber mat should have been placed over the hard tile floors and was missing on the day in question.

3. Defendant's breach of duty was the proximate cause of the Plaintiff's fall and the disc herniation she suffered as a result of the fall.

4. Plaintiff's injuries have resulted in special damages of $8,468.59 in medical expenses, as well as $8,109.90 for the exercise equipment she purchased for her business in early 2002.

5. Plaintiff's injuries have resulted in lost earning in 2002 in the amount of $9,670.00.

6. Plaintiff's injuries have resulted in lost earning capacity of $ 1,605,456.00. The Court will reduce this amount to $1,000.000.00 for present value.

7. Plaintiff is entitled to damages for past and future loss of enjoyment of life, pain and suffering and emotional distress in the amount of $400,000.00.

8. The conduct of Defendant, its agents and employees, in failing to repair the water leak which created the puddle in which Plaintiff slipped and fell, after two waitresses repeatedly requested that the water leak be repaired, was an intentional act committed with utter indifference or conscious disregard for the safety of visitors at the Sally Port Inn (wanton), or was intentional conduct committed with the knowledge that harm could result (willful), or was an intentional act committed with utter indifference to the consequences (reckless). NMRA 13-1827.

9. Plaintiff is entitled to an award of punitive damages against the Defendant in the amount of $500,000.00 for the limited purposes of punishment and to deter others from the commission of like offenses.

10. Plaintiff is entitled to an award of costs. Plaintiff is directed to submit a cost bill within ten (10) days of the entry of these Findings and Conclusions. Plaintiff's cost bill shall

contain her request for pre- and post-judgment interest, if any, and argument and authority in support thereof.

Respectfully submitted,

LAW OFFICES OF JAMES P. LYLE, P.C.

James P. Lyle
Attorney for Plaintiff Judith A. Mills
1116 Second Street, N.W.
Albuquerque, NM   87102
(505) 843-8000  / (505) 843-8043 - Facsimile

I hereby certify that a true copy of
the foregoing pleading was hand
delivered to opposing counsel of
record this 4th day of May, 2006.

James P. Lyle