# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**JUDITH MILLS**,

        Plaintiff,

    vs.                          No. 05-CV-151 MCA/LFG

**SOUTHWEST INNKEEPERS, INC.**
d/b/a Best Western Sally Port Inn & Suites,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on a bench trial held May 18, 2006 through May 19, 2006, *Plaintiff's First Motion in Limine to Exclude Defendant's Expert Opinions Related to Plaintiff's Injuries* [Doc. 53], *Defendant's Motion in Limine to Exclude Speculative Testimony Regarding Potential Income* [Doc. 64], and *Defendant's Motion in Limine to Exclude Plaintiff's Lost Earnings Exhibit* [Doc. 65]. Having considered the parties' submissions, the arguments of counsel, the relevant law, and otherwise being fully advised in the premises, I find in favor of Plaintiff Judith Mills. Pursuant to Fed.R.Civ.P. 52(a), I now enter the following Findings of Fact and Conclusions of Law.

I.    **FINDINGS OF FACT**

A.    **EVENTS OF JULY 1, 2002**

**Witness/Plaintiff Judith Mills**

1.    While on vacation on July 1, 2002, Plaintiff Judith Mills and her daughter Emily were lodgers at the Sally Port Inn, located in Roswell, New Mexico.

2.    The Sally Port Inn is owned by Defendant Southwest Innkeepers, Inc.

3.    On the morning of July 1, 2002, Plaintiff slipped and fell on the hard tile floor as she went through the breakfast buffet line at the Sally Port Inn's restaurant.

4.    As she fell, Plaintiff's feet suddenly slipped out from underneath her body, and she twisted around before catching herself on her waist on the side of the buffet bar, falling into the buffet cart.

5.    Plaintiff immediately experienced extreme pain, including shooting sensations through her leg and pain in the buttocks muscles and back.

6.    Plaintiff observed a puddle on the floor and food on the floor in the area where she slipped.  The floor was slippery.

7.    Immediately after the fall, Plaintiff spoke to the kitchen manager who told her that a rug should have been in place on the floor where she slipped but that he could not get his staff to put it there.

8.    After the fall, Plaintiff repeatedly requested that the kitchen manager

call an ambulance for her, but he refused to do so.  She was driven to a local hospital by a Sally Port Inn employee in a company vehicle.

9.     A CT scan was performed on Plaintiff at the hospital.

## Witness Tara Moe

10.     Tara Moe has worked as a waitress for approximately 17 years. Although Ms. Moe was working at the Sally Port Inn restaurant on the day of Plaintiff's fall, she did not observe the fall.  Ms. Moe testified to problems with the air-conditioning unit in the restaurant on the day of Plaintiff's fall, explaining that water would leak from the unit, which was located above the buffet table, on to the floor.

11.     Ms. Moe complained to management on numerous occasions regarding the puddle caused by the leaky air-conditioning unit and the need to fix the unit.

12.     Ms. Moe and other waitresses repeatedly asked that management provide floor mats to "make the whole place safe."

13.     Ms. Moe testified that melting ice from the buffet table similarly often leaked onto the floor, and that this issue also was repeatedly raised with management.  Ms. Moe testified, however, that the buffet table was not leaking on the day of Plaintiff's fall.

14.     I find Ms. Moe's testimony credible.

## Witness Theresa Lykins

15.   Theresa Lykins is an experienced waitress in Roswell. She was working at the Sally Port restaurant on the day Plaintiff fell.

16.   Ms. Lykins described the area of the floor where Plaintiff fell as being wet with a small puddle.

17.   Ms. Lykins observed similar water puddles on that floor on a regular basis during the summer.

18.   Ms. Lykins complained numerous times to management about the puddles on the floor.

19.   Ms. Lykins helped Plaintiff off the floor after her fall.

20.   I find Ms. Lykins's testimony credible.

### **Witness Frank De la O**

21.   Frank De la O was employed by the Sally Port Inn on July 1, 2002 as chief engineer.

22.   Because Mr. De la O was chief engineer, all staff complaints regarding wet floors or other problems were required to be brought to his attention.

23.   Mr. De la O was trained in refrigeration repair and his job duties included making repairs to equipment.

24.   According to Mr. De la O, only one air-conditioning leak occurred in the Sally Port Inn's restaurant in the summer of 2002, which he repaired prior to Plaintiff's fall.

4

25.   I do not accept as credible Mr. De la O's testimony that there had been *only* one air conditioning leak in the summer of 2002, prior to the date of Plaintiff's fall.

26.   Mr. De la O denied knowledge of any puddles forming on the floor in the breakfast buffet area, and testified that no puddles were reported to him.

27.   I do not find this testimony credible.

28.   Mr. De la O disagreed  that a mat should have been placed on the floor in the area of the breakfast buffet.

29.   According to Mr. De la O, either the Sally Port Inn's front office manager or one his own subordinates reported to him that there was water or liquid on the tile in the area where Plaintiff slipped.

**Witness Matthew Fowler**

30.   Matthew Fowler was the general manager of the Sally Port Inn in 2002.

31.   Mr. Fowler had authority to make all final decisions relating to policy concerning maintenance of the motel and repairs.

32.   The Sally Port Inn maintained an accident prevention policy.

33.   Mr. Fowler recalled only one leak in 2002, which occurred after equipment was installed on the roof, and which was repaired prior to Plaintiff's fall.

34.   Mr. Fowler testified that there was no policy requiring rugs to be

placed on the floor around the restaurant's breakfast buffet area because there was "nonslip tile" on the floor.

35. I find Mr. Fowler's testimony credible except for the implication that *only* one leak occurred in 2002.

## B. PLAINTIFF'S PERSONAL AND PROFESSIONAL BACKGROUND PRIOR TO THE ACCIDENT

36. At the time of the accident on July 1, 2002, Plaintiff was 42 years old, married to Daniel Mills, and the parent of a young daughter, Emily. She resided in Michigan.

37. Plaintiff is a high school graduate. Her post-high school education includes schooling related to fitness education and dance. She did not attend college.

38. Prior to the accident, Plaintiff enjoyed maintaining a garden at her home, tending to household chores, and managing her business as a fitness trainer. She also taught between seven and ten fitness classes per week at Oakland University.

39. Prior to the accident, Plaintiff's hobbies included bike riding, horseback riding, and going hiking and camping with her family. She also enjoyed snow skiing and boating.

40. Prior to July 2002, Plaintiff did not experience any significant physical or medical problems that impeded her ability to practice her profession

as a fitness trainer.

41.     Sometime prior to the fall, Plaintiff experienced a back problem after
having "lifted something wrong."  She was administered a trigger point
injection by her physician, Dr. Al Joucys, and the condition resolved
itself in a few days.

42.     Prior to her fall, Plaintiff experienced some depression and mood
swings, which she expressed to Dr. Joucys in 1999.

43.     Plaintiff was somewhat evasive in her responses to questions regarding
her medical history prior to the date of the accident.

44.     From approximately 1975 to the time of her accident in July, 2002,
Plaintiff worked full time as a professional fitness trainer and dance
and yoga instructor.  She often worked two to three jobs at a time.

45.     Plaintiff enjoyed a great deal of professional success prior to July 2002.

46.     Body movement is the essence of Plaintiff's chosen profession.
Consequently, Plaintiff must be able to move her back freely to perform
dance and fitness training.

47.     Prior to her accident, Plaintiff worked at the "elite" level of fitness
training.  This level represents the  highest physical ability in ballet,
fitness training, different forms of dance and movement, and movement
theory.

48.     In 1994 Plaintiff incorporated a business known as SmartBodies.

7

SmartBodies consisted of personal fitness-training programs customized to a particular client. The main focus of SmartBodies was movement training, yoga and Pilates, and such other forms of physical fitness techniques as Rolfing, hands-on stretching, massage work, and Swiss ball movement.

49.   Plaintiff began teaching classes in yoga and Pilates at Oakland University in 1999.

50.   Yoga constitutes a program of body movements that can be tailored to achieve strength, relaxation, rehabilitation, and stress reduction.

51.   A Pilates program has a specific set of exercises that progress and build upon each other.

52.   In 2002, prior to her fall, Plaintiff engaged in two to four sessions per day with her SmartBodies clients.

53.   In September 2002, Mr. Daniel Mills's job came to an end and he remained out of work until approximately April 2003, when he started a job in Orlando, Florida.

54.   Mr. Mills commuted to work in Florida from Michigan for a period of approximately 18 months. During this time, the Mills marriage became strained.

55.   I find that some of Plaintiff's depression, anxiety, and malaise is attributable to her strained marriage.

56.     Plaintiff experienced bouts of depression and mood swings prior to her fall.

57.     As of the date of trial, Plaintiff continues to experience pain and discomfort and has trouble sleeping.

58.     Plaintiff's pain and discomfort have interfered somewhat with her ability to enjoy intimacy and marital relations with her husband.

### The Duties of a Fitness Trainer

59.     As a professional fitness trainer working with clients,  Plaintiff was required to adjust and reconfigure various types of exercise equipment; lift and carry weights of varying sizes and weights; maintain, clean, and store exercise equipment; demonstrate the use of various types of exercise equipment; demonstrate movements;  move fairly heavy mats off of the equipment; and "spot" clients who were using the weight-training equipment.

60.     "Spotting" includes getting up and standing on the equipment to guide the exercising client's legs and back; performing hands-on stretches with the client; handing him or her exercise equipment; reconfiguring equipment, sometimes during the movement process; and adjusting equipment tensions mid-movement.

61.     With respect to her work, Plaintiff's own flexibility, balance, and strength were essential to her ability to train her clients.

9

62.    In order to maintain her level of fitness, Plaintiff devoted at least one hour per day to a warm-up routine, followed by a cyclical training program to prevent injuries.  Plaintiff testified that she would train for six weeks, "back off" for a week or two before "building up" again for six weeks, and then back off again for a week or two.  She often spent 90 minutes a day training herself.

## C.  POST-FALL MEDICAL DIAGNOSIS AND TREATMENT

### Witness Al Joucys, D.O.

63.    Dr. Al Joucys testified by deposition.  He is a family practice physician and has treated Plaintiff since May 1998.

64.    According to Dr. Joucys, Plaintiff experienced no serious orthopaedic or back problems that required treatment prior to July 2002.

65.    The CT scan performed on Plaintiff in the emergency room on the date of injury did not disclose any evidence of acute herniation.  The test presented a "negative CT scan of the lumbar spine."  It suggested that Plaintiff experienced a simple strain to her back.

66.    Upon such disclosure, Plaintiff undertook a course of treatment including pain medication and physical therapy.

67.    An MRI administered approximately 1 month and 20 days after the accident showed that Plaintiff had experienced a herniated disc.

68.    While the initial course of physical therapy that Plaintiff undertook was

10

an appropriate first-stage attempt to manage her symptoms, this therapy did not improve her condition or alleviate her pain.

69.    Plaintiff's MRI disclosed the following: acquired spinal canal stenosis, most notable at L4 and L5 and L3; mild congenital canal narrowing; herniated disc; diffuse lumbar spondylosis and degenerative disc disease with facet degenerative changes.

70.    Dr. Joucys attributed the herniated disc to the fall.

71.    According to Dr. Joucys, Plaintiff developed depression after the fall because she lost her job and could not remain physically active.

72.    Dr. Joucys described Plaintiff's level of depression as menial and mild and testified that it was controlled with medication.

73.    In 2003, Dr. Joucys referred Plaintiff to Dr. Lawrence Rapp, a neurologist who confirmed that Plaintiff had suffered a herniated disc, also known as an "annular rent."

74.    I accept Dr. Joucys's testimony as credible.

**Witness Lawrence Rapp, M.D.**

75.    Dr. Lawrence Rapp, a board certified neurosurgeon, testified via deposition.

76.    Dr. Rapp evaluated Plaintiff on June 5, 2003.

77.    In Dr. Rapp's opinion, Plaintiff had acquired and congenital stenosis, which pre-dated her fall.

11

78.   Dr. Rapp administered a myelogram in June 2003.

79.   In Dr. Rapp's opinion, Plaintiff's pain and physical symptoms were the result of a disc rupture.

80.   In Dr. Rapp's opinion, Plaintiff's fall caused the ruptured disc.

81.   Plaintiff's depression lasted from November 2002 until early spring 2003.

82.   I accept Dr. Rapp's testimony as credible.

**Witness Dale Hoekstra, M.D.**

83.   Dr. Dale Hoekstra, a board-certified orthopaedic surgeon, testified by deposition.

84.   Dr. Hoekstra testified that Plaintiff's back pain was caused by the combination of some degeneration in the lumbar spine and a right-sighted disc herniation at L4-5.

85.   According to Dr. Hoekstra, disc herniation can be caused by a traumatic event such as a slip-and-fall.

86.   Dr. Hoekstra testified that it is relatively common for a person to suffer from degenerative problems for years without appearing symptomatic and then, as a consequence of having experienced an acute event such as a slip-and-fall resulting in a disc herniation, become symptomatic as to those degenerative problems.  According to Dr. Hoekstra, Plaintiff's symptoms are consistent with this scenario.

87.    As a result of his evaluation of her, Dr. Hoekstra concluded that Plaintiff had embellished her symptoms to some extent.

88.    At the time of his evaluation, Dr. Hoekstra believed that Plaintiff would improve with physical therapy and would not require surgical intervention.

89.    Had Plaintiff requested surgery, Dr. Hoekstra would have recommended a right L4-5 lumbar decompress laminectomy and diskectomey.

90.    A right L4-5 lumbar decompress laminectomy and diskectomey would require hospital admission and would cost approximately $10,000, inclusive.

91.    Plaintiff incurred medical expenses with Dr. Hoekstra in the amount of $273.00.

92.    I accept Dr. Hoekstra's testimony as credible.

### Witness William Gonte, M.D.

93.    Dr. William Gonte testified, in person, for Defendant.   He is a specialist in sports medicine and has practiced medicine since 1990.

94.    Although Dr. Gonte conducts Independent Medical Examinations, they constitute less than 5-10% of his practice.

95.    Dr. Gonte conducted an evaluation of Plaintiff consisting of a physical exam and a review of her medical history.

13

96.     In Dr. Gonte's opinion, disc herniations are common in adults over 30 years of age and are rarely of any clinical significance.

97.     In Dr. Gonte's opinion, most—if not all—disc herniations are caused by the degenerative changes in the spine that accompany the aging process.

98.     At the time of his examination of her, Dr. Gonte believed that Plaintiff's complaints all related to soft tissue and/or the musculoskeletal system and bore no relationship at all to the spine.

99.     In Dr. Gonte's opinion, the CT scan, myelogram, and MRI performed on Plaintiff disclosed conditions consistent with preexisting degenerative arthritis, unrelated to the slip-and-fall, and did not disclose evidence of acute herniation or acute pathology.

100.    In Dr. Gonte's opinion, Plaintiff's symptoms as noted in her pre-accident medical history were consistent with those with which she presented to Dr. Gonte.

101.    In Dr. Gonte's opinion, Plaintiff has preexisting degenerative arthritis multiple levels in her spine as a result of the aging process.

102.    Dr. Gonte is not an orthopaedic surgeon, and he has neither trained nor practiced as a neurologist, neurosurgeon, or radiologist.

103.    Dr. Gonte formed his opinions about Plaintiff before he reviewed the vast majority of her medical records.

14

104.   Dr. Gonte conducted a cursory physical examination and evaluation of Plaintiff and review of her records.

105.   I do not accept as credible Dr. Gonte's opinion that Plaintiff's symptoms were entirely unrelated to the slip-and-fall.

106.   I find that Dr. Gonte's testimony is entitled to less weight than that of the other doctors who testified in this matter.

## D.  DAMAGES

107.   Plaintiff was not paid for every hour she worked because she spent some of her time "warming up" before client sessions, performing tasks necessary to the marketing and advertising of her business, and maintaining a current level of knowledge regarding the profession.

108.   Since the accident and because of pain and discomfort and a lack of stamina, Plaintiff has been unable to teach yoga, Pilates and other fitness techniques at her former level (elite).

109.   Plaintiff had expected to teach seven to ten yoga and Pilates classes at the Oakland University in 2002 and 2003.  Enrollment in each class was expected to be 50 persons.

110.   In 2002, prior to her accident, Plaintiff worked close to 20 hours per week at SmartBodies.  It was at this time that she decided to expand the business by, among other things, purchasing new equipment and forming a board of directors.

15

111. Prior to 2002 Plaintiff occasionally received $65.00 per hour for a private training lesson. Sixty-five dollars represents the "high end" of payment.

112. The rate of $15.00 to $25.00 per class member was normal for group classes.

113. Classes consisted of between 20 and 30 people.

114. Prior to the accident, Plaintiff had been negotiating with the Bloomfield Hills (MI) Middle School ("Bloomfield Hills") to establish a training program for teachers in September 2002. After the accident, between approximately September 2002 and January 2003, Bloomfield Hills expressed an interest in Plaintiff conducting a class of about 15 students.

115. Plaintiff had an expectation of practicing her profession until at least age 55.

116. Plaintiff attempted to teach SmartBodies classes after the slip-and-fall, but was unable to do so. She could not teach classes at Oakland University and she similarly could not teach at Bloomfield Hills.

117. In 2004 Plaintiff and her family relocated to Virginia, where she sought other employment, and where her husband obtained new employment.

118. Plaintiff elected not to attempt surgical repair of her back injury after physical therapy and medical treatment did not significantly improve

16

her condition.  Since moving to Virginia, Plaintiff has chosen to use yoga and exercise to maintain her physical condition to the best of her ability.

119.   Plaintiff's attempts to make a career change have been unsuccessful.

120.   Although Plaintiff prepared a business plan for expanding SmartBodies, she did not calculate with any degree of specificity the costs or expenses that would be incurred in operating the expanded business. The plan was never implemented.

121.   In anticipation of expanding SmartBodies in 2002, Plaintiff purchased new fitness-training equipment in the amount of $8,109.00.  After the accident, she later sold some of that equipment for $2,000.

122.   Plaintiff's condition has somewhat impacted her ability to enjoy the day-to-day personal and familial activities that she enjoyed prior to the slip-and-fall.

123.   Had she not expanded her business, Plaintiff believed she would have earned $85,000 per year working with her existing client base and teaching classes at Bloomfield Hills.

124.   In this regard, the teachers at Bloomfield Hills expressed an interest in having Plaintiff come in two or three mornings a week, before school, to conduct physical-training classes of 15 pupils.   Plaintiff also testified, however, that "this group of teachers liked to have a different

17

trainer every year and liked to do something different every year."

125.   In this regard, I can infer the certainty of Plaintiff teaching at Bloomfield Hills during the 2002-2003 school year, but I cannot reasonably infer that she would have been retained for subsequent school years.

126.   Because of her injury, Plaintiff is unable to obtain CPR certification or a Pilates certification.  Such certifications are required in order for her to conduct these particular types of fitness training.

127.   I accept, and find credible, Plaintiff's testimony as to the levels or degrees of fitness she must achieve and maintain in order to perform specific types of fitness training for her clients.

128.   I further accept, and find credible, Plaintiff's testimony that certain deficiencies or weaknesses in her own body strength and flexibility and balance can adversely affect her ability to physically manage exercise/fitness equipment, spot her clients, and otherwise demonstrate the fitness activity that she desires to communicate to her clients.

129.   I find less credible Plaintiff's testimony that the fall rendered her permanently unable to engage in  any aspect of the fitness-training profession, particularly those aspects not requiring that she exhibit a state of complete physical fitness at the "elite" level.

### E.  TABLES OF MEDICAL BILLS AND TAXES

130.    I find that the following medical expenses were reasonably incurred in treating Plaintiff after the fall:

MEDICAL EXPENSES

| Exhibit No. | Physician, Facility, and/or Medical Test | Amount |
|---|---|---|
| 1. | Dr. Lawrence G. Rapp<br>Neurosurgical Consultants, P.C.<br>Clarkston, MI | $   745.00 |
| 2. | TheraMatrix Physical Rehabilitation<br>Rochester, MI | $1,450.00 |
| 3. | Dr. Dale V. Hoekstra<br>Rochester Hills Orthopaedics<br>Rochester, MI | $   273.00 |
| 4. | Macomb Foot & Ankle (treatment records)<br>(no address) | *no bills |
| 5. | Neil King Physical Therapy<br>Rochester, MI | $1,745.00 |
| 6. | Dr. Al Joucys<br>Rochester Hills Family Physicians<br>Rochester Hills, MI | $   748.00 |
|  | MRI on 8/21/02 | $1,004.00 |
| 7. | Eastern New Mexico Medical Center<br>Roswell, NM | $2,918.36 |
| 8. | Dynamic Rehabilitation Centers, Inc.<br>(treatment records)<br>(no address) | *no bills |
|  | TOTAL | $8,883.36 |

* Plaintiff submitted records of treatment from these facilities; however, no statements of expenses were submitted.

### F. PLAINTIFF'S INCOME AND EARNINGS PRIOR TO FALL

131.  I find that the following tables accurately reflect Plaintiff's income and

earnings prior to the fall:

**Breakdown of Plaintiff's Income from Smart Bodies as taken from Tax Returns (Exhibit E)**

| Year | Gross Income | Profit | Loss |
|------|------|------|------|
| 1999  *Pilates & Smart Bodies, Yoga* | $1,760.00 | | $1,515.00 |
| 2000  *Pilates & Smart Bodies, Yoga* | $9,040.00 | $3,818.00 | |
| 2001  *Pilates & Smart Bodies, Yoga* | $10,425.00 | $6,029.00 | |
| 2002  *Pilates & Yoga* | $6,730.00 | $732.00 | |
| 2003 | None | | $1,851.00 |
| 2004 | None | | $1,146.00 |

**Breakdown of Plaintiff's income from sources other than Smart Bodies as taken from Tax Returns (Exhibit E)**

| Year | Amount |
|------|------|
| 1999  *Body Method & Oakland University* | $8,857.00 |
| 2000  *Oakland University* | $3,333.00 |
| 2001  *Oakland University* | $4,433.00 |
| 2002  *Oakland University* | $2,490.00 |

## II.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.  Liability

"In New Mexico, 'a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages.'" Chavez v. Desert Eagle Distrib. Co. of N.M., 151 P.3d 77, 80 (N.M.App. 2006) (*quoting* Herrera v. Quality Pontiac, 73 P.3d 181 (N.M. 2003)).  In the context of a business owner and its visitors, the former owes the latter the duty to exercise ordinary care to keep the premises safe for visitor use. This duty applies whether or not a dangerous condition is obvious.  Moreover, in performing this duty, the owner is charged with knowledge of any condition on the premises of which the owner would have had knowledge had it made a reasonable inspection of the premises, or which was caused by the owner or its employees. NMRA Civ. UJI 13-1318; see also Brooks v. K-Mart Corp., 964 P.2d 98, 99 (N.M. 1998). "Ordinary care" means that care that a reasonably prudent person would use in the conduct of the person's own affairs, and varies with the nature of what is being done.  However, as the risk of danger that should reasonably be foreseen increases, the amount of care required also increases. In deciding whether ordinary care has been used, the conduct in question must be considered in the light of all the surrounding circumstances.  NMRA Civ. UJI 13-1603. Thus, "[i]n a slip and fall case, a business visitor must prove that an owner or occupier of the premises failed to exercise ordinary care by rendering safe an unreasonably dangerous condition on the premises known to, or discoverable upon reasonable investigation by, the

21

owner or occupier." Brooks, 964 P.2d at 101.

In the instant case, Defendant owed Plaintiff a duty to exercise ordinary care to keep safe the area around the breakfast buffet at the Sally Port Inn's restaurant. Defendant breached that duty by failing to take reasonable steps to remedy the slippery floor, knowledge of which, the credible trial testimony has established, Defendant either possessed or should have possessed.[1] To be sure, Tara Moe testified that water would leak from an air-conditioning unit located above the buffet table onto the floor, and that she complained to management on numerous occasions regarding the puddle caused by the leaky air-conditioning unit and the need to fix the unit. Additionally, Ms. Moe and other waitresses repeatedly asked that management provide floor mats to "make the whole place safe." Theresa Lykins credibly testified that (1) the area of the floor where Plaintiff fell was wet with a small puddle; (2) she observed similar puddles on that floor on a regular basis during the summer of 2002; and (3) she complained numerous times to management about those puddles.

In this regard, the nearly 50-year old case of Barakos v. Sponduris, 325 P.2d 712 (N.M. 1958) is instructive. In that case, a restaurant customer "slipped on something . . . grease or water[,]" causing him to sustain personal injuries. The jury returned a verdict for the plaintiff in the amount of $5,000. Barakos, 325 P.2d at 713. Referring to testimony from one of defendant's waitresses (a Ms. Gallanos) that she routinely cleaned up garbage left on

---

[1] There is no evidence to support the conclusion that Plaintiff was comparatively negligent.

the floor by the night shift when she opened defendant's restaurant in the morning, the Supreme Court of New Mexico concluded that "[i]f, as testified by witness Gallanos, a messy condition was a continuing occurrence, an inference could reasonably be drawn that the floor was wet and messy . . . at the time of plaintiff's fall and constituted a dangerous condition." Id. at 714. Moreover,

> [t]he mere presence of a slick or slippery spot on a floor does not in and of itself establish negligence, for this condition may arise temporarily in any place of business. Kitts v. Shop Rite Foods, Inc., N.M., 323 P.2d 282. However, this case is clearly distinguishable from a situation where a fall is caused by a momentary slick or slippery condition of which a proprietor has no notice and thus no opportunity to remove or guard against it. If, as testified by witness Gallanos, the messy condition . . . was a continuing occurrence—in effect a pattern of conduct—then an inference could reasonably be drawn that the defendant had, or should have had, knowledge of this condition.

Id. The credible evidence as detailed above in Section I also supports the conclusion that Defendant's breach was the proximate cause of Plaintiff's fall and the injuries she sustained as a result. Thus, the Court now turns to a determination of Plaintiff's damages.

## B. Damages[2]

### 1. Medical Expenses

"The measure of damages for personal injury includes the reasonable cost of the care, services and attention made necessary by the injury[.]" Jones v. Pollock, 383 P.2d 271, 273

---

[2] The Court has considered Plaintiff's duty to mitigate damages, as well as Defendant's burden of proving that she failed to mitigate. See Blacker v. U-Haul Co. of New Mexico, Inc., 828 P.2d 975, 979 (N.M.App. 1992).

(N.M. 1963).  In this case, Plaintiff incurred a total of $8,883.36 in medical expenses as a result of the slip-and-fall.  Consequently, Plaintiff is entitled to recover that amount in actual damages.

### 2. Pain and Suffering

In determining an amount of money that will reasonably and fairly compensate Plaintiff for the pain and suffering she has sustained as a result of the slip-and-fall, the Court has considered the nature, extent, and duration of Plaintiff's injuries, as well as her emotional distress and loss of enjoyment of life.   In light of these considerations, the Court concludes that Plaintiff is entitled to an award of damages for pain and suffering, loss of quality of life, and emotional distress in the amount of $100,000.00.  See UJI 13-1802 NMRA, UJI 13-1806 NMRA, UJI 13-1807 NMRA, and UJI 13-1808 NMRA; see also Sandoval v. Chrysler Corp., 960 P.2d 834, 838 (N.M. App. 1998) (recognizing that there is no standard fixed by law for measuring the value of pain and suffering and explaining that the amount of such an award necessarily rests with the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is just compensation (internal quotations omitted)).

### 3. Lost Earnings

Plaintiff further sustained lost earnings in the amount of $9,220.00 for the second half of 2002.  She is entitled to recover this amount.  She also is entitled to recover the $40,500.00[3] she would have earned from training Bloomfield Hills teachers during the 2002-

---

[3] 15 students each paying $25.00 per class and attending 3 classes a week for 36 weeks (approximately one school year) comes to $40,500.

2003 school year.  Thus, Plaintiff is entitled to recover lost earnings in the amount of $49,720.00.

### 4. Lost Earning Capacity

Plaintiff also seeks damages representing her lost earning capacity, which is different from lost earnings.  The Court's starting point on the issue of loss-of-earning-capacity damages is Instruction 13-1803 of New Mexico's Uniform Jury Instructions, which provides for the recovery of "[t]he value of lost earnings [and the present cash value of earning capacity reasonably certain to be lost in the future]."  NMRA Civ. UJI 13-1803. The calculation of this type of damages, however, does not lend itself to any precise mathematical formula.[4]  Instead, their computation is a matter left to the Court's reasonable discretion.  In the present case, Plaintiff presented no evidence from an economist or accountant as to the value of her lost earning capacity or lost future earnings, nor was she required to.  The Court therefore turns to relevant case authority for guidance.

In <u>Johnson v. City of Santa Fe</u>, the New Mexico Supreme Court upheld the trial court's award of $10,000.00 in damages to a Santa Fe resident who fell into an open sewer trench while on her way to mass. <u>Johnson v. City of Santa Fe</u>, 290 P. 793, 793 (N.M. 1930). The Court rejected the defendant's contention that damages were excessive, given that they were based on findings of permanent injury that resulted in the reduction of the plaintiff's

---

[4] Or, to put it another way, "[t]he very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty."  <u>Finnie v. Vallee</u>, 620 So.2d 897, 901 (La. Ct. App. 1993).

monthly earning capacity from $150.00 to $20.00, as well as a consideration of her age and life expectancy.  The Court concluded that "[t]he damages seem[ed] to be liberal, but, admitting the permanency of the injury, not beyond the limits of the trial court's reasonable discretion."  Id. at 795.

That damages for lost earning capacity cannot be calculated with precision was emphasized in Turrietta v. Wyche, where the New Mexico Supreme Court affirmed the award of $15,000.00 to a plaintiff whose arm was sheared off in an automobile accident.  At the time of the accident, the plaintiff was a student in automotive mechanics who, according to the deposition testimony of his instructor, had the capacity to become "a topflight automotive mechanic."  Turrietta v. Wyche, 212 P.2d 1041, 1044 (N.M. 1949).  After the accident, however, the plaintiff was working as a counter clerk at a wholesale automotive parts house and his earning capacity had been reduced by fifty percent.  Elaborating on the meaning of the term "earning capacity," the Court stated that

> [e]arning capacity does not necessarily mean the actual earnings that one who suffers an injury was making at the time the injuries were sustained. It refers to that which, by virtue of the training, the experience, and the business acumen possessed, an individual is capable of earning. He might not actually have been earning anything at the time his earning capacity was impaired.

Id. at 1045 (quoting Texas Elec. Ry. v. Worthy, 250 S.W. 710, 712 (Tex. Civ. App. 1923)).[5]

---

[5] Indeed,

> [e]arning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the

After reviewing other courts' approaches to the issue of lost-earning-capacity damages, the

Turrietta Court made the following pronouncement:

> No general rule can be formulated that would properly control the admission of evidence to prove a man's future earning capacity. It must be arrived at largely from probabilities; and any evidence that would fairly indicate his present earning capacity, and the probability of its increase or decrease in the future ought to be admitted. This would include evidence of age, intelligence, habits, health, occupation, life expectancy, ability, the probable increase in skill, rates of wages paid generally to those following his vocation, particularly so, where as in this case, the injured person has fitted himself for, but has not entered into, the work or business of his chosen vocation. [citations omitted].
>
> It may be that such testimony is speculative . . . but no more so than any that has for its purpose the proof of future action or events. It is all problematical at best.

Id. at 1047.

Other cases similarly confirm that damages for lost earning capacity are not dependent

on evidence of the plaintiff's earnings before and after the incident or accident.  In Jackson

v. Southwestern Pub. Serv. Co., the plaintiff recovered $95,000.00 (subsequently reduced)

in lost-earning-capacity damages after he further injured a bad leg by stepping into a hole in

a street he was attempting to cross.  As a result of the aggravation of the pre-existing injury,

---

> injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.

Folse v. Fakouri, 371 So.2d 1120, 1124 (La. 1979).

the plaintiff's leg was amputated. Commenting on the trial court's decision not to allow the

plaintiff to present evidence of business losses, the New Mexico Supreme Court noted that

> [i]n a case of this kind, a plaintiff may show any diminution in
> his earning capacity that he desires by proper evidence.
> However, we believe that, in the absence of such evidence, the
> jury can consider the matter of the loss of the limb, and that it
> may award substantial   damages for such loss without any
> testimony concerning the decrease in the earning capacity of the
> plaintiff.

Jackson v. Southwestern Pub. Serv. Co., 349 P.2d 1029, 1036 (N.M. 1960).  The Court then

quoted with approval from a case in which the Supreme Court of California held that

> [i]f the circumstances which were before the jury show that by
> reason of the injury he has become unable to perform the labor
> or transact the business which he was accustomed to transact or
> perform prior thereto, he is entitled to recover damages therefor;
> and from the nature of the investigation the amount of such
> recovery must be left to the wise discretion of the jury. It needs
> no evidence to show that a plaintiff in full health and vigor, who
> has lost an arm or a hand by reason of the negligence of the
> defendant, has had his earning power greatly impaired; and in
> such a case a jury would not be limited to nominal damages,
> although there should be no evidence that he was in the receipt
> of wages at the time of the injury, but would be authorized to
> give substantial damages.

Id. (quoting Storrs v. Los Angeles Traction Co., 66 P. 72, 73 (Cal. 1901)). To be sure,

"whether there is any evidence of past earnings or of any decrease in plaintiff's earning

capacity, proof of a continuing disability or an irreparable physical injury is all that is needed

to permit the fact-finder to 'award substantial damages' for loss of wage-earning ability."

Methola v. Eddy County, 96 629 P.2d 350, 355 (N.M.App. 1981) (error not to award

damages where trial court specifically found that injured party had suffered the loss of his

28

wage-earning ability as a result of defendants' tortious conduct).  Moreover, so long as it is credible and truthful, a plaintiff's own testimony may suffice in proving her claim of lost earning capacity.  Finnie, 620 So.2d at 901; see also Mobley v. Garcia, 217 P.2d 256 (N.M. 1950) (affirming award of loss-of-earning-capacity damages on the basis of plaintiff's own trial testimony).

In the instant case, the Court concludes that the best indicator or predictor of Plaintiff's lost earning capacity is the amount of work she did, and the income she received, as a fitness trainer during the first half of 2002.  In this regard, I expressly reject Plaintiff's claim of a loss of earning capacity based on the SmartBodies business plan comprising Exhibit 9.  While the plan contemplates "the production, manufacture and delivery of products," as well as the recruitment of additional trainers, and speaks of the "considerable demand for exercise related products and services," it does not adequately address such considerations as costs, overhead, salaries, equipment-related expenses, or other business expenditures.  At best, the plan presents a vague outline projecting certain income or revenue for SmartBodies, but without the benefit of assessing the costs reasonably expected to be incurred in conducting the business.

In 2002, prior to the slip-and-fall, Plaintiff had increased her weekly fitness-training hours and the resulting increased income is reflected in the earnings she received during the first six months of that year.  By her own testimony, had she not expanded SmartBodies, Plaintiff predicted that she would have earned $85,000.00 in 2002.  While I accept that, in 2002 prior to the fall, Plaintiff was able to commit more of her time to fitness training, I

cannot accept as reasonable her claim that she would have earned approximately $75,000.00 during the last six months of that year.[6]  A more realistic projection based upon the evidence is that Plaintiff would have earned a total of approximately $20,000.00 from SmartBodies in 2002, in addition to the approximately $40,000 she would have earned if she had been able to work at Bloomfield Hills during the 2002-2003 school year.  The Court notes, however, Plaintiff's testimony that the Bloomfield Hills teachers "liked to have a different trainer every year and liked to do something different every year."   This testimony indicates that annual renewal of the Bloomfield Hills agreement was speculative, if not unlikely.

I conclude that Plaintiff is entitled to recover a total of $300,000.00[7] in lost-earning-capacity damages.

### 5. Punitive Damages

Punitive or exemplary damages may be assessed to punish a defendant, as well as to serve as a deterrent and warning for others.   Gonzales v. Sansoy, 703 P.2d 904, 906 (N.M.App. 1984).   Such damages, however, represent an "extraordinary civil remedy . . . appropriately restricted to only the most egregious of wrongs."   Jessen v. Nat'l Excess Ins. Co., 776 P.2d 1244, 1250 (N.M. 1989) (Scarborough, J., dissenting).  Recovery of punitive damages is permissible if the factfinder determines that the wrongdoer's conduct was willful,

---

[6]  $85,000.00 less the $9,220.00 that Plaintiff earned in the first half of 2002.

[7]  This figure contemplates that, in addition to the $20,000 annual income Plaintiff could reasonably have expected to earn from SmartBodies, she likely also would have been able to add more group classes to her schedule.

wanton, malicious, reckless, oppressive, or fraudulent and in bad faith.  Bogle v. Summit Inv.

Co., LLC, 107 P.3d 520, 530 (N.M.App. 2005).[8]  Any one of the reasons for assessing

punitive damages is sufficient to sustain an award, Bank of New Mexico v. Rice, 429 P.2d

368 (1967), but "[t]o be liable for punitive damages, a wrongdoer *must* have some culpable

mental state[.]"  Clay v. Ferrellgas, Inc., 881 P.2d 11, 14 (N.M. 1994) (emphasis added).

Thus, with respect to the states of mind that may serve as a basis for an award of punitive

damages, the following considerations apply.  "Willful conduct is the intentional doing of

an act with knowledge that harm may result."  Weststar Mortg. Corp. v. Jackson, 39 P.3d

710, 724 (N.M.App. 2001).  "Malice  . . . means the intentional doing of a wrongful act

without just cause or excuse. This means that the defendant not only intended to do the act

which is ascertained to be wrongful, but that he knew it was wrong when he did it."  Galindo

v. Western States Collection Co., 477 P.2d 325, 330 (N.M.App. 1970).  "Recklessness in the

context of punitive damages is 'the intentional doing of an act with utter indifference to the

consequences.'"  Couch v. Astec Indus., Inc., 53 P.3d 398, 411 (N.M.App. 2002) (*quoting*

Torres v. El Paso Elec. Co.,  987 P.2d 386, 397 (N.M. 1999)).  Prior similar incidents may

---

[8]  See also NMRA, Civ. UJI 13-1827:

> If you find that the conduct of _____ (*name of party against*
> *whom direct liability for punitive damages is asserted*) was
> [malicious], [willful], [reckless], [wanton], [fraudulent] [or] [in bad
> faith], then you may award punitive damages against [him] [her]
> [it].

support a finding of punitive damages by establishing knowledge, attitude, or response to dangers that the defendant knew or should have known about prior to the plaintiff's injury. McNeill v. Rice Eng'g and Operating, Inc., 70 P.3d 794, 804 (N.M.App. 2003).

In determining the propriety of assessing punitive damages, the wrongdoer's conduct should be viewed in light of the risks of danger arising from the activity. Indeed, as the risk increases, conduct that amounts to a breach of duty is more likely to demonstrate a culpable mental state. Id. "In other words, the circumstances define the conduct . . . [and] the enormity and nature of the wrong must be assessed." Id. (internal quotations omitted).

In this case, the Court determines that the credible evidence does not support the conclusion that Defendant acted with such a culpable state of mind as to justify the imposition of the "extraordinary civil remedy" of punitive damages, which is "appropriately restricted to only the most egregious of wrongs." Jessen, 776 P.2d at 1250 (Scarborough, J., dissenting). This is because the credible evidence simply does not support the determination that Defendant acted intentionally. What Defendant did not do was exercise ordinary care to keep safe the area around the breakfast buffet at the Sally Port Inn's restaurant. Evidence that Defendant knew or should have known that the floor area around the breakfast buffet was in unreasonably dangerous condition at the time of Plaintiff's fall does not constitute evidence that Defendant acted willfully (i.e., intentionally doing an act with knowledge that harm may result), maliciously (intentionally doing a wrongful act without just cause or excuse), or even recklessly (intentionally doing an act with utter indifference to the consequences). There also was no evidence presented of prior similar

32

incidents (*i.e.*, falls), such that the imposition of punitive damages would be justified by Defendant's knowledge, attitude, or response to dangers it knew or should have known about prior to Plaintiff's fall.   See <u>McNeill</u>, 70 P.3d at 804.   For these reasons, the Court determines that the evidence does not support an award of punitive damages.

## III.   CONCLUSION

For the foregoing reasons, I find in favor of Plaintiff Judith Mills with respect to her negligence claim against Defendant Southwest Innkeepers, Inc., as set forth more fully in her *Complaint for Personal Injuries*.

**IT IS, THEREFORE, ORDERED** that the Court finds in favor of Plaintiff Judith Mills on her negligence claim against Defendant Southwest Innkeepers, Inc.;

**IT IS FURTHER ORDERED** that Plaintiff Judith Mills shall recover from Defendant Southwest Innkeepers, Inc. a total sum of $8,883.36 in medical expenses;

**IT IS FURTHER ORDERED** that Plaintiff Judith Mills shall recover from Defendant Southwest Innkeepers, Inc. a total sum of $100,000.00 in damages for pain and suffering, loss of quality of life, and emotional distress;

**IT IS FURTHER ORDERED** that Plaintiff Judith Mills shall recover from Defendant Southwest Innkeepers, Inc. a total sum of $49,720.00 in lost-earnings damages;

**IT IS FURTHER ORDERED** that Plaintiff Judith Mills shall recover from Defendant Southwest Innkeepers, Inc. a total sum of $300,000.00 in lost-earning-capacity damages;

**IT IS FURTHER ORDERED** that *Plaintiff's First Motion in Limine to Exclude Defendant's Expert Opinions Related to Plaintiff's Injuries* [Doc. 53] is **DENIED**;

**IT IS FURTHER ORDERED** that *Defendant's Motion in Limine to Exclude Speculative Testimony Regarding Potential Income* [Doc. 64] is **GRANTED**;

**IT IS FURTHER ORDERED** that *Defendant's Motion in Limine to Exclude Plaintiff's Lost Earnings Exhibit* [Doc. 65] is **GRANTED**.

**SO ORDERED** this 30th day of March, 2007, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO


**JUDITH MILLS**,

      Plaintiff,

    vs.                          No. 05-CV-151 MCA/LFG

**SOUTHWEST INNKEEPERS, INC.**
d/b/a Best Western Sally Port Inn & Suites,

      Defendant.


## <u>MEMORANDUM OPINION AND ORDER</u>


      **THIS MATTER** came before the Court on a bench trial held May 18, 2006 through

May 19, 2006, *Plaintiff's First Motion in Limine to Exclude Defendant's Expert Opinions*

*Related to Plaintiff's Injuries* [Doc. 53], *Defendant's Motion in Limine to Exclude*

*Speculative Testimony Regarding Potential Income* [Doc. 64], and *Defendant's Motion in*

*Limine to Exclude Plaintiff's Lost Earnings Exhibit* [Doc. 65].  Having considered the

parties' submissions, the arguments of counsel, the relevant law, and otherwise being fully

advised in the premises, I find in favor of Plaintiff Judith Mills.  Pursuant to Fed.R.Civ.P.

52(a), I now enter the following Findings of Fact and Conclusions of Law.


1

I.   **FINDINGS OF FACT**

A.   **EVENTS OF JULY 1, 2002**

**Witness/Plaintiff Judith Mills**

1.   While on vacation on July 1, 2002, Plaintiff Judith Mills and her daughter Emily were lodgers at the Sally Port Inn, located in Roswell, New Mexico.

2.   The Sally Port Inn is owned by Defendant Southwest Innkeepers, Inc.

3.   On the morning of July 1, 2002, Plaintiff slipped and fell on the hard tile floor as she went through the breakfast buffet line at the Sally Port Inn's restaurant.

4.   As she fell, Plaintiff's feet suddenly slipped out from underneath her body, and she twisted around before catching herself on her waist on the side of the buffet bar, falling into the buffet cart.

5.   Plaintiff immediately experienced extreme pain, including shooting sensations through her leg and pain in the buttocks muscles and back.

6.   Plaintiff observed a puddle on the floor and food on the floor in the area where she slipped.  The floor was slippery.

7.   Immediately after the fall, Plaintiff spoke to the kitchen manager who told her that a rug should have been in place on the floor where she slipped but that he could not get his staff to put it there.

8.   After the fall, Plaintiff repeatedly requested that the kitchen manager

2

call an ambulance for her, but he refused to do so.  She was driven to a local hospital by a Sally Port Inn employee in a company vehicle.

9.     A CT scan was performed on Plaintiff at the hospital.

### Witness Tara Moe

10.     Tara Moe has worked as a waitress for approximately 17 years. Although Ms. Moe was working at  the Sally Port Inn restaurant on the day of Plaintiff's fall, she did not observe the fall.  Ms. Moe testified to problems with the air-conditioning unit in the restaurant on the day of Plaintiff's fall, explaining that water would leak from the unit, which was located above the buffet table, on to the floor.

11.     Ms. Moe complained to management on numerous occasions regarding the puddle caused by the leaky air-conditioning unit and the need to fix the unit.

12.     Ms. Moe and other waitresses repeatedly asked that management provide floor mats to "make the whole place safe."

13.     Ms. Moe testified that melting ice from the buffet table similarly often leaked onto the floor, and that this issue also was repeatedly raised with management.  Ms. Moe testified, however, that the buffet table was not leaking on the day of Plaintiff's fall.

14.     I find Ms. Moe's testimony credible.

### Witness Theresa Lykins

3

15.    Theresa Lykins is an experienced waitress in Roswell.  She was working at the Sally Port restaurant on the day Plaintiff fell.

16.    Ms. Lykins described the area of the floor where Plaintiff fell as being wet with a small puddle.

17.    Ms. Lykins observed similar water puddles on that floor on a regular basis during the summer.

18.    Ms. Lykins complained numerous times to management about the puddles on the floor.

19.    Ms. Lykins helped Plaintiff off the floor after her fall.

20.    I find Ms. Lykins's testimony credible.

**Witness Frank De la O**

21.    Frank De la O was employed by the Sally Port Inn on July 1, 2002 as chief engineer.

22.    Because Mr. De la O was chief engineer, all staff complaints regarding wet floors or other problems were required to be brought to his attention.

23.    Mr. De la O was trained in refrigeration repair and his job duties included making repairs to equipment.

24.    According to Mr. De la O, only one air-conditioning leak occurred in the Sally Port Inn's restaurant in the summer of 2002, which he repaired prior to Plaintiff's fall.

4

25.   I do not accept as credible Mr. De la O's testimony that there had been *only* one air conditioning leak in the summer of 2002, prior to the date of Plaintiff's fall.

26.   Mr. De la O denied knowledge of any puddles forming on the floor in the breakfast buffet area, and testified that no puddles were reported to him.

27.   I do not find this testimony credible.

28.   Mr. De la O disagreed  that a mat should have been placed on the floor in the area of the breakfast buffet.

29.   According to Mr. De la O, either the Sally Port Inn's front office manager or one his own subordinates reported to him that there was water or liquid on the tile in the area where Plaintiff slipped.

**Witness Matthew Fowler**

30.   Matthew Fowler was the general manager of the Sally Port Inn in 2002.

31.   Mr. Fowler had authority to make all final decisions relating to policy concerning maintenance of the motel and repairs.

32.   The Sally Port Inn maintained an accident prevention policy.

33.   Mr. Fowler recalled only one leak in 2002, which occurred after equipment was installed on the roof, and which was repaired prior to Plaintiff's fall.

34.   Mr. Fowler testified that there was no policy requiring rugs to be

5

placed on the floor around the restaurant's breakfast buffet area because there was "nonslip tile" on the floor.

35.     I find Mr. Fowler's testimony credible except for the implication that *only* one leak occurred in 2002.

## B.     PLAINTIFF'S PERSONAL AND PROFESSIONAL BACKGROUND PRIOR TO THE ACCIDENT

36.     At the time of the accident on July 1, 2002, Plaintiff was 42 years old, married to Daniel Mills, and the parent of a young daughter, Emily. She resided in Michigan.

37.     Plaintiff is a high school graduate.  Her post-high school education includes schooling related to fitness education and dance.  She did not attend college.

38.     Prior to the accident, Plaintiff enjoyed maintaining a garden at her home, tending to household chores, and managing her business as a fitness trainer.  She also taught between seven and ten fitness classes per week at Oakland University.

39.     Prior to the accident, Plaintiff's hobbies included bike riding, horseback riding, and going hiking and camping with her family.  She also enjoyed snow skiing and boating.

40.     Prior to July 2002, Plaintiff did not experience any significant physical or medical problems that impeded her ability to practice her profession

as a fitness trainer.

41.  Sometime prior to the fall, Plaintiff experienced a back problem after having "lifted something wrong."  She was administered a trigger point injection by her physician, Dr. Al Joucys, and the condition resolved itself in a few days.

42.  Prior to her fall, Plaintiff experienced some depression and mood swings, which she expressed to Dr. Joucys in 1999.

43.  Plaintiff was somewhat evasive in her responses to questions regarding her medical history prior to the date of the accident.

44.  From approximately 1975 to the time of her accident in July, 2002, Plaintiff worked full time as a professional fitness trainer and dance and yoga instructor.  She often worked two to three jobs at a time.

45.  Plaintiff enjoyed a great deal of professional success prior to July 2002.

46.  Body movement is the essence of Plaintiff's chosen profession. Consequently, Plaintiff must be able to move her back freely to perform dance and fitness training.

47.  Prior to her accident, Plaintiff worked at the "elite" level of fitness training.  This level represents the  highest physical ability in ballet, fitness training, different forms of dance and movement, and movement theory.

48.  In 1994 Plaintiff incorporated a business known as SmartBodies.

7

SmartBodies consisted of personal fitness-training programs customized to a particular client. The main focus of SmartBodies was movement training, yoga and Pilates, and such other forms of physical fitness techniques as Rolfing, hands-on stretching, massage work, and Swiss ball movement.

49. Plaintiff began teaching classes in yoga and Pilates at Oakland University in 1999.

50. Yoga constitutes a program of body movements that can be tailored to achieve strength, relaxation, rehabilitation, and stress reduction.

51. A Pilates program has a specific set of exercises that progress and build upon each other.

52. In 2002, prior to her fall, Plaintiff engaged in two to four sessions per day with her SmartBodies clients.

53. In September 2002, Mr. Daniel Mills's job came to an end and he remained out of work until approximately April 2003, when he started a job in Orlando, Florida.

54. Mr. Mills commuted to work in Florida from Michigan for a period of approximately 18 months. During this time, the Mills marriage became strained.

55. I find that some of Plaintiff's depression, anxiety, and malaise is attributable to her strained marriage.

56.     Plaintiff experienced bouts of depression and mood swings prior to her fall.

57.     As of the date of trial, Plaintiff continues to experience pain and discomfort and has trouble sleeping.

58.     Plaintiff's pain and discomfort have interfered somewhat with her ability to enjoy intimacy and marital relations with her husband.

### The Duties of a Fitness Trainer

59.     As a professional fitness trainer working with clients, Plaintiff was required to adjust and reconfigure various types of exercise equipment; lift and carry weights of varying sizes and weights; maintain, clean, and store exercise equipment; demonstrate the use of various types of exercise equipment; demonstrate movements; move fairly heavy mats off of the equipment; and "spot" clients who were using the weight-training equipment.

60.     "Spotting" includes getting up and standing on the equipment to guide the exercising client's legs and back; performing hands-on stretches with the client; handing him or her exercise equipment; reconfiguring equipment, sometimes during the movement process; and adjusting equipment tensions mid-movement.

61.     With respect to her work, Plaintiff's own flexibility, balance, and strength were essential to her ability to train her clients.

62.     In order to maintain her level of fitness, Plaintiff devoted at least one hour per day to a warm-up routine, followed by a cyclical training program to prevent injuries.  Plaintiff testified that she would train for six weeks, "back off" for a week or two before "building up" again for six weeks, and then back off again for a week or two.  She often spent 90 minutes a day training herself.

## C.  POST-FALL MEDICAL DIAGNOSIS AND TREATMENT

### Witness Al Joucys, D.O.

63.     Dr. Al Joucys testified by deposition.  He is a family practice physician and has treated Plaintiff since May 1998.

64.     According to Dr. Joucys, Plaintiff experienced no serious orthopaedic or back problems that required treatment prior to July 2002.

65.     The CT scan performed on Plaintiff in the emergency room on the date of injury did not disclose any evidence of acute herniation.  The test presented a "negative CT scan of the lumbar spine."  It suggested that Plaintiff experienced a simple strain to her back.

66.     Upon such disclosure, Plaintiff undertook a course of treatment including pain medication and physical therapy.

67.     An MRI administered approximately 1 month and 20 days after the accident showed that Plaintiff had experienced a herniated disc.

68.     While the initial course of physical therapy that Plaintiff undertook was

an appropriate first-stage attempt to manage her symptoms, this therapy did not improve her condition or alleviate her pain.

69.   Plaintiff's MRI disclosed the following: acquired spinal canal stenosis, most notable at L4 and L5 and L3; mild congenital canal narrowing; herniated disc; diffuse lumbar spondylosis and degenerative disc disease with facet degenerative changes.

70.   Dr. Joucys attributed the herniated disc to the fall.

71.   According to Dr. Joucys, Plaintiff developed depression after the fall because she lost her job and could not remain physically active.

72.   Dr. Joucys described Plaintiff's level of depression as menial and mild and testified that it was controlled with medication.

73.   In 2003, Dr. Joucys referred Plaintiff to Dr. Lawrence Rapp, a neurologist who confirmed that Plaintiff had suffered a herniated disc, also known as an "annular rent."

74.   I accept Dr. Joucys's testimony as credible.

**Witness Lawrence Rapp, M.D.**

75.   Dr. Lawrence Rapp, a board certified neurosurgeon, testified via deposition.

76.   Dr. Rapp evaluated Plaintiff on June 5, 2003.

77.   In Dr. Rapp's opinion, Plaintiff had acquired and congenital stenosis, which pre-dated her fall.

78.   Dr. Rapp administered a myelogram in June 2003.

79.   In Dr. Rapp's opinion, Plaintiff's pain and physical symptoms were the result of a disc rupture.

80.   In Dr. Rapp's opinion, Plaintiff's fall caused the ruptured disc.

81.   Plaintiff's depression lasted from November 2002 until early spring 2003.

82.   I accept Dr. Rapp's testimony as credible.

### Witness Dale Hoekstra, M.D.

83.   Dr. Dale Hoekstra, a board-certified orthopaedic surgeon, testified by deposition.

84.   Dr. Hoekstra testified that Plaintiff's back pain was caused by the combination of some degeneration in the lumbar spine and a right-sighted disc herniation at L4-5.

85.   According to Dr. Hoekstra, disc herniation can be caused by a traumatic event such as a slip-and-fall.

86.   Dr. Hoekstra testified that it is relatively common for a person to suffer from degenerative problems for years without appearing symptomatic and then, as a consequence of having experienced an acute event such as a slip-and-fall resulting in a disc herniation, become symptomatic as to those degenerative problems.  According to Dr. Hoekstra, Plaintiff's symptoms are consistent with this scenario.

87.   As a result of his evaluation of her, Dr. Hoekstra concluded that Plaintiff had embellished her symptoms to some extent.

88.   At the time of his evaluation, Dr. Hoekstra believed that Plaintiff would improve with physical therapy and would not require surgical intervention.

89.   Had Plaintiff requested surgery, Dr. Hoekstra would have recommended a right L4-5 lumbar decompress laminectomy and diskectomey.

90.   A right L4-5 lumbar decompress laminectomy and diskectomey would require hospital admission and would cost approximately $10,000, inclusive.

91.   Plaintiff incurred medical expenses with Dr. Hoekstra in the amount of $273.00.

92.   I accept Dr. Hoekstra's testimony as credible.

### Witness William Gonte, M.D.

93.   Dr. William Gonte testified, in person, for Defendant.   He is a specialist in sports medicine and has practiced medicine since 1990.

94.   Although Dr. Gonte conducts Independent Medical Examinations, they constitute less than 5-10% of his practice.

95.   Dr. Gonte conducted an evaluation of Plaintiff consisting of a physical exam and a review of her medical history.

13

96.   In Dr. Gonte's opinion, disc herniations are common in adults over 30 years of age and are rarely of any clinical significance.

97.   In Dr. Gonte's opinion, most—if not all—disc herniations are caused by the degenerative changes in the spine that accompany the aging process.

98.   At the time of his examination of her, Dr. Gonte believed that Plaintiff's complaints all related to soft tissue and/or the musculoskeletal system and bore no relationship at all to the spine.

99.   In Dr. Gonte's opinion, the CT scan, myelogram, and MRI performed on Plaintiff disclosed conditions consistent with preexisting degenerative arthritis, unrelated to the slip-and-fall, and did not disclose evidence of acute herniation or acute pathology.

100.  In Dr. Gonte's opinion, Plaintiff's symptoms as noted in her pre-accident medical history were consistent with those with which she presented to Dr. Gonte.

101.  In Dr. Gonte's opinion, Plaintiff has preexisting degenerative arthritis multiple levels in her spine as a result of the aging process.

102.  Dr. Gonte is not an orthopaedic surgeon, and he has neither trained nor practiced as a neurologist, neurosurgeon, or radiologist.

103.  Dr. Gonte formed his opinions about Plaintiff before he reviewed the vast majority of her medical records.

14

104.   Dr. Gonte conducted a cursory physical examination and evaluation of Plaintiff and review of her records.

105.   I do not accept as credible Dr. Gonte's opinion that Plaintiff's symptoms were entirely unrelated to the slip-and-fall.

106.   I find that Dr. Gonte's testimony is entitled to less weight than that of the other doctors who testified in this matter.

## D. DAMAGES

107.   Plaintiff was not paid for every hour she worked because she spent some of her time "warming up" before client sessions, performing tasks necessary to the marketing and advertising of her business, and maintaining a current level of knowledge regarding the profession.

108.   Since the accident and because of pain and discomfort and a lack of stamina, Plaintiff has been unable to teach yoga, Pilates and other fitness techniques at her former level (elite).

109.   Plaintiff had expected to teach seven to ten yoga and Pilates classes at the Oakland University in 2002 and 2003.  Enrollment in each class was expected to be 50 persons.

110.   In 2002, prior to her accident, Plaintiff worked close to 20 hours per week at SmartBodies.  It was at this time that she decided to expand the business by, among other things, purchasing new equipment and forming a board of directors.

15

111.   Prior to 2002 Plaintiff occasionally received $65.00 per hour for a private training lesson.  Sixty-five dollars represents the "high end" of payment.

112.   The rate of $15.00 to $25.00 per class member was normal for group classes.

113.   Classes consisted of between 20 and 30 people.

114.   Prior to the accident, Plaintiff had been negotiating with the Bloomfield Hills (MI) Middle School ("Bloomfield Hills") to establish a training program for teachers in September 2002.  After the accident, between approximately September 2002 and January 2003, Bloomfield Hills expressed an interest in Plaintiff conducting a class of about 15 students.

115.   Plaintiff had an expectation of practicing her profession until at least age 55.

116.   Plaintiff attempted to teach SmartBodies classes after the slip-and-fall, but was unable to do so.  She could not teach classes at Oakland University and she similarly could not teach at Bloomfield Hills.

117.   In 2004 Plaintiff and her family relocated to Virginia, where she sought other employment, and where her husband obtained new employment.

118.   Plaintiff elected not to attempt surgical repair of her back injury after physical therapy and medical treatment did not significantly improve

16

her condition.  Since moving to Virginia, Plaintiff has chosen to use yoga and exercise to maintain her physical condition to the best of her ability.

119.   Plaintiff's attempts to make a career change have been unsuccessful.

120.   Although Plaintiff prepared a business plan for expanding SmartBodies, she did not calculate with any degree of specificity the costs or expenses that would be incurred in operating the expanded business. The plan was never implemented.

121.   In anticipation of expanding SmartBodies in 2002, Plaintiff purchased new fitness-training equipment in the amount of $8,109.00.  After the accident, she later sold some of that equipment for $2,000.

122.   Plaintiff's condition has somewhat impacted her ability to enjoy the day-to-day personal and familial activities that she enjoyed prior to the slip-and-fall.

123.   Had she not expanded her business, Plaintiff believed she would have earned $85,000 per year working with her existing client base and teaching classes at Bloomfield Hills.

124.   In this regard, the teachers at Bloomfield Hills expressed an interest in having Plaintiff come in two or three mornings a week, before school, to conduct physical-training classes of 15 pupils.   Plaintiff also testified, however, that "this group of teachers liked to have a different

17

trainer every year and liked to do something different every year."

125. In this regard, I can infer the certainty of Plaintiff teaching at Bloomfield Hills during the 2002-2003 school year, but I cannot reasonably infer that she would have been retained for subsequent school years.

126. Because of her injury, Plaintiff is unable to obtain CPR certification or a Pilates certification. Such certifications are required in order for her to conduct these particular types of fitness training.

127. I accept, and find credible, Plaintiff's testimony as to the levels or degrees of fitness she must achieve and maintain in order to perform specific types of fitness training for her clients.

128. I further accept, and find credible, Plaintiff's testimony that certain deficiencies or weaknesses in her own body strength and flexibility and balance can adversely affect her ability to physically manage exercise/fitness equipment, spot her clients, and otherwise demonstrate the fitness activity that she desires to communicate to her clients.

129. I find less credible Plaintiff's testimony that the fall rendered her permanently unable to engage in any aspect of the fitness-training profession, particularly those aspects not requiring that she exhibit a state of complete physical fitness at the "elite" level.

18

## E.  TABLES OF MEDICAL BILLS AND TAXES

130.   I find that the following medical expenses were reasonably incurred in treating Plaintiff after the fall:

MEDICAL EXPENSES

| Exhibit No. | Physician, Facility, and/or Medical Test | Amount |
|---|---|---:|
| 1. | Dr. Lawrence G. Rapp<br>Neurosurgical Consultants, P.C.<br>Clarkston, MI | $   745.00 |
| 2. | TheraMatrix Physical Rehabilitation<br>Rochester, MI | $1,450.00 |
| 3. | Dr. Dale V. Hoekstra<br>Rochester Hills Orthopaedics<br>Rochester, MI | $   273.00 |
| 4. | Macomb Foot & Ankle (treatment records)<br>(no address) | *no bills |
| 5. | Neil King Physical Therapy<br>Rochester, MI | $1,745.00 |
| 6. | Dr. Al Joucys<br>Rochester Hills Family Physicians<br>Rochester Hills, MI | $   748.00 |
|  | MRI on 8/21/02 | $1,004.00 |
| 7. | Eastern New Mexico Medical Center<br>Roswell, NM | $2,918.36 |
| 8. | Dynamic Rehabilitation Centers, Inc.<br>(treatment records)<br>(no address) | *no bills |
|  | TOTAL | $8,883.36 |

* Plaintiff submitted records of treatment from these facilities; however, no statements of expenses were submitted.

## F. PLAINTIFF'S INCOME AND EARNINGS PRIOR TO FALL

131.   I find that the following tables accurately reflect Plaintiff's income and earnings prior to the fall:

**Breakdown of Plaintiff's Income from Smart Bodies as taken from Tax Returns (Exhibit E)**

| Year | Gross Income | Profit | Loss |
|------|------|------|------|
| 1999  *Pilates & Smart Bodies, Yoga* | $1,760.00 | | $1,515.00 |
| 2000  *Pilates & Smart Bodies, Yoga* | $9,040.00 | $3,818.00 | |
| 2001  *Pilates & Smart Bodies, Yoga* | $10,425.00 | $6,029.00 | |
| 2002  *Pilates & Yoga* | $6,730.00 | $732.00 | |
| 2003 | None | | $1,851.00 |
| 2004 | None | | $1,146.00 |

**Breakdown of Plaintiff's income from sources other than Smart Bodies as taken from Tax Returns (Exhibit E)**

| Year | Amount |
|------|------|
| 1999  *Body Method & Oakland University* | $8,857.00 |
| 2000  *Oakland University* | $3,333.00 |
| 2001  *Oakland University* | $4,433.00 |
| 2002  *Oakland University* | $2,490.00 |

## II.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.  Liability

"In New Mexico, 'a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages.'" Chavez v. Desert Eagle Distrib. Co. of N.M., 151 P.3d 77, 80 (N.M.App. 2006) (*quoting* Herrera v. Quality Pontiac, 73 P.3d 181 (N.M. 2003)).  In the context of a business owner and its visitors, the former owes the latter the duty to exercise ordinary care to keep the premises safe for visitor use. This duty applies whether or not a dangerous condition is obvious.  Moreover, in performing this duty, the owner is charged with knowledge of any condition on the premises of which the owner would have had knowledge had it made a reasonable inspection of the premises, or which was caused by the owner or its employees. NMRA Civ. UJI 13-1318; see also Brooks v. K-Mart Corp., 964 P.2d 98, 99 (N.M. 1998). "Ordinary care" means that care that a reasonably prudent person would use in the conduct of the person's own affairs, and varies with the nature of what is being done.  However, as the risk of danger that should reasonably be foreseen increases, the amount of care required also increases. In deciding whether ordinary care has been used, the conduct in question must be considered in the light of all the surrounding circumstances.  NMRA Civ. UJI 13-1603. Thus, "[i]n a slip and fall case, a business visitor must prove that an owner or occupier of the premises failed to exercise ordinary care by rendering safe an unreasonably dangerous condition on the premises known to, or discoverable upon reasonable investigation by, the

21

owner or occupier." <u>Brooks</u>, 964 P.2d at 101.

In the instant case, Defendant owed Plaintiff a duty to exercise ordinary care to keep safe the area around the breakfast buffet at the Sally Port Inn's restaurant. Defendant breached that duty by failing to take reasonable steps to remedy the slippery floor, knowledge of which, the credible trial testimony has established, Defendant either possessed or should have possessed.[1] To be sure, Tara Moe testified that water would leak from an air-conditioning unit located above the buffet table onto the floor, and that she complained to management on numerous occasions regarding the puddle caused by the leaky air-conditioning unit and the need to fix the unit. Additionally, Ms. Moe and other waitresses repeatedly asked that management provide floor mats to "make the whole place safe." Theresa Lykins credibly testified that (1) the area of the floor where Plaintiff fell was wet with a small puddle; (2) she observed similar puddles on that floor on a regular basis during the summer of 2002; and (3) she complained numerous times to management about those puddles.

In this regard, the nearly 50-year old case of <u>Barakos v. Sponduris</u>, 325 P.2d 712 (N.M. 1958) is instructive. In that case, a restaurant customer "slipped on something . . . grease or water[,]" causing him to sustain personal injuries. The jury returned a verdict for the plaintiff in the amount of $5,000. <u>Barakos</u>, 325 P.2d at 713. Referring to testimony from one of defendant's waitresses (a Ms. Gallanos) that she routinely cleaned up garbage left on

---

[1] There is no evidence to support the conclusion that Plaintiff was comparatively negligent.

the floor by the night shift when she opened defendant's restaurant in the morning, the Supreme Court of New Mexico concluded that "[i]f, as testified by witness Gallanos, a messy condition was a continuing occurrence, an inference could reasonably be drawn that the floor was wet and messy . . . at the time of plaintiff's fall and constituted a dangerous condition." <u>Id.</u> at 714.  Moreover,

> [t]he mere presence of a slick or slippery spot on a floor does not in and of itself establish negligence, for this condition may arise temporarily in any place of business. <u>Kitts v. Shop Rite Foods, Inc.</u>, N.M., 323 P.2d 282. However, this case is clearly distinguishable from a situation where a fall is caused by a momentary slick or slippery condition of which a proprietor has no notice and thus no opportunity to remove or guard against it. If, as testified by witness Gallanos, the messy condition . . . was a continuing occurrence—in effect a pattern of conduct—then an inference could reasonably be drawn that the defendant had, or should have had, knowledge of this condition.

<u>Id.</u>  The credible evidence as detailed above in Section I also supports the conclusion that Defendant's breach was the proximate cause of Plaintiff's fall and the injuries she sustained as a result.  Thus, the Court now turns to a determination of Plaintiff's damages.

### B. Damages[2]

### 1. Medical Expenses

"The measure of damages for personal injury includes the reasonable cost of the care, services and attention made necessary by the injury[.]" <u>Jones v. Pollock</u>, 383 P.2d 271, 273

---

[2]  The Court has considered Plaintiff's duty to mitigate damages, as well as Defendant's burden of proving that she failed to mitigate.  <u>See</u> <u>Blacker v. U-Haul Co. of New Mexico, Inc.</u>, 828 P.2d 975, 979 (N.M.App. 1992).

(N.M. 1963).  In this case, Plaintiff incurred a total of $8,883.36 in medical expenses as a result of the slip-and-fall.  Consequently, Plaintiff is entitled to recover that amount in actual damages.

### 2. Pain and Suffering

In determining an amount of money that will reasonably and fairly compensate Plaintiff for the pain and suffering she has sustained as a result of the slip-and-fall, the Court has considered the nature, extent, and duration of Plaintiff's injuries, as well as her emotional distress and loss of enjoyment of life.   In light of these considerations, the Court concludes that Plaintiff is entitled to an award of damages for pain and suffering, loss of quality of life, and emotional distress in the amount of $100,000.00.  See UJI 13-1802 NMRA, UJI 13-1806 NMRA, UJI 13-1807 NMRA, and UJI 13-1808 NMRA; see also Sandoval v. Chrysler Corp., 960 P.2d 834, 838 (N.M. App. 1998) (recognizing that there is no standard fixed by law for measuring the value of pain and suffering and explaining that the amount of such an award necessarily rests with the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is just compensation (internal quotations omitted)).

### 3. Lost Earnings

Plaintiff further sustained lost earnings in the amount of $9,220.00 for the second half of 2002.  She is entitled to recover this amount.  She also is entitled to recover the $40,500.00[3] she would have earned from training Bloomfield Hills teachers during the 2002-

---

[3] 15 students each paying $25.00 per class and attending 3 classes a week for 36 weeks (approximately one school year) comes to $40,500.

2003 school year. Thus, Plaintiff is entitled to recover lost earnings in the amount of $49,720.00.

### 4. Lost Earning Capacity

Plaintiff also seeks damages representing her lost earning capacity, which is different from lost earnings. The Court's starting point on the issue of loss-of-earning-capacity damages is Instruction 13-1803 of New Mexico's Uniform Jury Instructions, which provides for the recovery of "[t]he value of lost earnings [and the present cash value of earning capacity reasonably certain to be lost in the future]." NMRA Civ. UJI 13-1803. The calculation of this type of damages, however, does not lend itself to any precise mathematical formula.[4] Instead, their computation is a matter left to the Court's reasonable discretion. In the present case, Plaintiff presented no evidence from an economist or accountant as to the value of her lost earning capacity or lost future earnings, nor was she required to. The Court therefore turns to relevant case authority for guidance.

In Johnson v. City of Santa Fe, the New Mexico Supreme Court upheld the trial court's award of $10,000.00 in damages to a Santa Fe resident who fell into an open sewer trench while on her way to mass. Johnson v. City of Santa Fe, 290 P. 793, 793 (N.M. 1930). The Court rejected the defendant's contention that damages were excessive, given that they were based on findings of permanent injury that resulted in the reduction of the plaintiff's

---

[4] Or, to put it another way, "[t]he very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty." Finnie v. Vallee, 620 So.2d 897, 901 (La. Ct. App. 1993).

monthly earning capacity from $150.00 to $20.00, as well as a consideration of her age and life expectancy.  The Court concluded that "[t]he damages seem[ed] to be liberal, but, admitting the permanency of the injury, not beyond the limits of the trial court's reasonable discretion."  Id. at 795.

That damages for lost earning capacity cannot be calculated with precision was emphasized in Turrietta v. Wyche, where the New Mexico Supreme Court affirmed the award of $15,000.00 to a plaintiff whose arm was sheared off in an automobile accident.  At the time of the accident, the plaintiff was a student in automotive mechanics who, according to the deposition testimony of his instructor, had the capacity to become "a topflight automotive mechanic."  Turrietta v. Wyche, 212 P.2d 1041, 1044 (N.M. 1949).  After the accident, however, the plaintiff was working as a counter clerk at a wholesale automotive parts house and his earning capacity had been reduced by fifty percent.  Elaborating on the meaning of the term "earning capacity," the Court stated that

> [e]arning capacity does not necessarily mean the actual earnings
> that one who suffers an injury was making at the time the
> injuries were sustained. It refers to that which, by virtue of the
> training, the experience, and the business acumen possessed, an
> individual is capable of earning. He might not actually have
> been earning anything at the time his earning capacity was
> impaired.

Id. at 1045 (quoting Texas Elec. Ry. v. Worthy, 250 S.W. 710, 712 (Tex. Civ. App. 1923)).[5]

---

[5] Indeed,

> [e]arning capacity in itself is not necessarily determined by actual
> loss; damages may be assessed for the deprivation of what the

After reviewing other courts' approaches to the issue of lost-earning-capacity damages, the

Turrietta Court made the following pronouncement:

> No general rule can be formulated that would properly control the admission of evidence to prove a man's future earning capacity. It must be arrived at largely from probabilities; and any evidence that would fairly indicate his present earning capacity, and the probability of its increase or decrease in the future ought to be admitted. This would include evidence of age, intelligence, habits, health, occupation, life expectancy, ability, the probable increase in skill, rates of wages paid generally to those following his vocation, particularly so, where as in this case, the injured person has fitted himself for, but has not entered into, the work or business of his chosen vocation. [citations omitted].
>
> It may be that such testimony is speculative . . . but no more so than any that has for its purpose the proof of future action or events. It is all problematical at best.

Id. at 1047.

Other cases similarly confirm that damages for lost earning capacity are not dependent

on evidence of the plaintiff's earnings before and after the incident or accident.  In Jackson

v. Southwestern Pub. Serv. Co., the plaintiff recovered $95,000.00 (subsequently reduced)

in lost-earning-capacity damages after he further injured a bad leg by stepping into a hole in

a street he was attempting to cross.  As a result of the aggravation of the pre-existing injury,

---

> injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.

Folse v. Fakouri, 371 So.2d 1120, 1124 (La. 1979).

the plaintiff's leg was amputated. Commenting on the trial court's decision not to allow the

plaintiff to present evidence of business losses, the New Mexico Supreme Court noted that

> [i]n a case of this kind, a plaintiff may show any diminution in his earning capacity that he desires by proper evidence. However, we believe that, in the absence of such evidence, the jury can consider the matter of the loss of the limb, and that it may award substantial   damages for such loss without any testimony concerning the decrease in the earning capacity of the plaintiff.

Jackson v. Southwestern Pub. Serv. Co., 349 P.2d 1029, 1036 (N.M. 1960).  The Court then

quoted with approval from a case in which the Supreme Court of California held that

> [i]f the circumstances which were before the jury show that by reason of the injury he has become unable to perform the labor or transact the business which he was accustomed to transact or perform prior thereto, he is entitled to recover damages therefor; and from the nature of the investigation the amount of such recovery must be left to the wise discretion of the jury. It needs no evidence to show that a plaintiff in full health and vigor, who has lost an arm or a hand by reason of the negligence of the defendant, has had his earning power greatly impaired; and in such a case a jury would not be limited to nominal damages, although there should be no evidence that he was in the receipt of wages at the time of the injury, but would be authorized to give substantial damages.

Id. (quoting Storrs v. Los Angeles Traction Co., 66 P. 72, 73 (Cal. 1901)). To be sure,

"whether there is any evidence of past earnings or of any decrease in plaintiff's earning

capacity, proof of a continuing disability or an irreparable physical injury is all that is needed

to permit the fact-finder to 'award substantial damages' for loss of wage-earning ability."

Methola v. Eddy County, 96 629 P.2d 350, 355 (N.M.App. 1981) (error not to award

damages where trial court specifically found that injured party had suffered the loss of his

wage-earning ability as a result of defendants' tortious conduct).  Moreover, so long as it is

credible and truthful, a plaintiff's own testimony may suffice in proving her claim of lost

earning capacity.  Finnie, 620 So.2d at 901; see also Mobley v. Garcia, 217 P.2d 256 (N.M.

1950) (affirming award of loss-of-earning-capacity damages on the basis of plaintiff's own

trial testimony).

In the instant case, the Court concludes that the best indicator or predictor of

Plaintiff's lost earning capacity is the amount of work she did, and the income she received,

as a fitness trainer during the first half of 2002.  In this regard, I expressly reject Plaintiff's

claim of a loss of earning capacity based on the SmartBodies business plan comprising

Exhibit 9.  While the plan contemplates "the production, manufacture and delivery of

products," as well as the recruitment of additional trainers, and speaks of the "considerable

demand for exercise related products and services," it does not adequately address such

considerations as costs, overhead, salaries, equipment-related expenses, or other business

expenditures.  At best, the plan presents a vague outline projecting certain income or revenue

for SmartBodies, but without the benefit of assessing the costs reasonably expected to be

incurred in conducting the business.

In 2002, prior to the slip-and-fall, Plaintiff had increased her weekly fitness-training

hours and the resulting increased income is reflected in the earnings she received during the

first six months of that year.  By her own testimony, had she not expanded SmartBodies,

Plaintiff predicted that she would have earned $85,000.00 in 2002.  While I accept that, in

2002 prior to the fall, Plaintiff was able to commit more of her time to fitness training, I

29

cannot accept as reasonable her claim that she would have earned approximately $75,000.00 during the last six months of that year.[6]  A more realistic projection based upon the evidence is that Plaintiff would have earned a total of approximately $20,000.00 from SmartBodies in 2002, in addition to the approximately $40,000 she would have earned if she had been able to work at Bloomfield Hills during the 2002-2003 school year.  The Court notes, however, Plaintiff's testimony that the Bloomfield Hills teachers "liked to have a different trainer every year and liked to do something different every year."  This testimony indicates that annual renewal of the Bloomfield Hills agreement was speculative, if not unlikely.

I conclude that Plaintiff is entitled to recover a total of $300,000.00[7] in lost-earning-capacity damages.

### 5. Punitive Damages

Punitive or exemplary damages may be assessed to punish a defendant, as well as to serve as a deterrent and warning for others.  Gonzales v. Sansoy, 703 P.2d 904, 906 (N.M.App. 1984).  Such damages, however, represent an "extraordinary civil remedy . . . appropriately restricted to only the most egregious of wrongs."  Jessen v. Nat'l Excess Ins. Co., 776 P.2d 1244, 1250 (N.M. 1989) (Scarborough, J., dissenting).  Recovery of punitive damages is permissible if the factfinder determines that the wrongdoer's conduct was willful,

---

[6]  $85,000.00 less the $9,220.00 that Plaintiff earned in the first half of 2002.

[7]  This figure contemplates that, in addition to the $20,000 annual income Plaintiff could reasonably have expected to earn from SmartBodies, she likely also would have been able to add more group classes to her schedule.

wanton, malicious, reckless, oppressive, or fraudulent and in bad faith.  <u>Bogle v. Summit Inv.</u>

<u>Co., LLC</u>, 107 P.3d 520, 530 (N.M.App. 2005).[8]  Any one of the reasons for assessing

punitive damages is sufficient to sustain an award, <u>Bank of New Mexico v. Rice</u>, 429 P.2d

368 (1967), but "[t]o be liable for punitive damages, a wrongdoer *must* have some culpable

mental state[.]"  <u>Clay v. Ferrellgas</u>, Inc., 881 P.2d 11, 14 (N.M. 1994) (emphasis added).

Thus, with respect to the states of mind that may serve as a basis for an award of punitive

damages, the following considerations apply.  "Willful conduct is the intentional doing of

an act with knowledge that harm may result."  <u>Weststar Mortg. Corp. v. Jackson</u>, 39 P.3d

710, 724 (N.M.App. 2001).  "Malice  . . . means the intentional doing of a wrongful act

without just cause or excuse. This means that the defendant not only intended to do the act

which is ascertained to be wrongful, but that he knew it was wrong when he did it."  <u>Galindo</u>

<u>v. Western States Collection Co.</u>, 477 P.2d 325, 330 (N.M.App. 1970).  "Recklessness in the

context of punitive damages is 'the intentional doing of an act with utter indifference to the

consequences.'"  <u>Couch v. Astec Indus., Inc.</u>, 53 P.3d 398, 411 (N.M.App. 2002) (*quoting*

<u>Torres v. El Paso Elec. Co.</u>,  987 P.2d 386, 397 (N.M. 1999)).  Prior similar incidents may

---

[8]  <u>See also</u> NMRA, Civ. UJI 13-1827:

> If you find that the conduct of _____ (*name of party against whom direct liability for punitive damages is asserted*) was [malicious], [willful], [reckless], [wanton], [fraudulent] [or] [in bad faith], then you may award punitive damages against [him] [her] [it].

support a finding of punitive damages by establishing knowledge, attitude, or response to dangers that the defendant knew or should have known about prior to the plaintiff's injury. McNeill v. Rice Eng'g and Operating, Inc., 70 P.3d 794, 804 (N.M.App. 2003).

In determining the propriety of assessing punitive damages, the wrongdoer's conduct should be viewed in light of the risks of danger arising from the activity.  Indeed, as the risk increases, conduct that amounts to a breach of duty is more likely to demonstrate a culpable mental state.  Id.  "In other words, the circumstances define the conduct . . .  [and] the enormity and nature of the wrong must be assessed."  Id. (internal quotations omitted).

In this case, the Court determines that the credible evidence does not support the conclusion that Defendant acted with such a culpable state of mind as to justify the imposition of the "extraordinary civil remedy" of punitive damages, which is "appropriately restricted to only the most egregious of wrongs."  Jessen, 776 P.2d at 1250 (Scarborough, J., dissenting).   This is because the credible evidence simply does not support the determination that Defendant acted intentionally.  What Defendant did not do was exercise ordinary care to keep safe the area around the breakfast buffet at the Sally Port Inn's restaurant.  Evidence that Defendant knew or should have known that the floor area around the breakfast buffet was in unreasonably dangerous condition at the time of Plaintiff's fall does not constitute evidence that Defendant acted willfully (*i.e.*, intentionally doing an act with knowledge that harm may result), maliciously (intentionally doing a wrongful act without just cause or excuse), or even recklessly (intentionally doing an act with utter indifference to the consequences).  There also was no evidence presented of prior similar

32

incidents (*i.e.*, falls), such that the imposition of punitive damages would be justified by Defendant's knowledge, attitude, or response to dangers it knew or should have known about prior to Plaintiff's fall.   See McNeill, 70 P.3d at 804.   For these reasons, the Court determines that the evidence does not support an award of punitive damages.

## III.   CONCLUSION

For the foregoing reasons, I find in favor of Plaintiff Judith Mills with respect to her negligence claim against Defendant Southwest Innkeepers, Inc., as set forth more fully in her *Complaint for Personal Injuries*.

**IT IS, THEREFORE, ORDERED** that the Court finds in favor of Plaintiff Judith Mills on her negligence claim against Defendant Southwest Innkeepers, Inc.;

**IT IS FURTHER ORDERED** that Plaintiff Judith Mills shall recover from Defendant Southwest Innkeepers, Inc. a total sum of $8,883.36 in medical expenses;

**IT IS FURTHER ORDERED** that Plaintiff Judith Mills shall recover from Defendant Southwest Innkeepers, Inc. a total sum of $100,000.00 in damages for pain and suffering, loss of quality of life, and emotional distress;

**IT IS FURTHER ORDERED** that Plaintiff Judith Mills shall recover from Defendant Southwest Innkeepers, Inc. a total sum of $49,720.00 in lost-earnings damages;

**IT IS FURTHER ORDERED** that Plaintiff Judith Mills shall recover from Defendant Southwest Innkeepers, Inc. a total sum of $300,000.00 in lost-earning-capacity damages;

**IT IS FURTHER ORDERED** that *Plaintiff's First Motion in Limine to Exclude Defendant's Expert Opinions Related to Plaintiff's Injuries* [Doc. 53] is **DENIED**;

**IT IS FURTHER ORDERED** that *Defendant's Motion in Limine to Exclude Speculative Testimony Regarding Potential Income* [Doc. 64] is **GRANTED**;

**IT IS FURTHER ORDERED** that *Defendant's Motion in Limine to Exclude Plaintiff's Lost Earnings Exhibit* [Doc. 65] is **GRANTED**.

**SO ORDERED** this 30th day of March, 2007, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

34